Good morning ladies and gentlemen. We're pleased to have Judge Ellis sitting with us this morning by designation from the District Court here on the North District of Illinois and we'll move directly to the first case which is by speakerphone as I understand it. Mr. Blood are you there? Yes your honor. Can you hear me all right? Not quite well enough. We'll turn it up a little bit here and maybe if you'll move closer to your microphone or your phone. I'm as close as I can get your honor. Is that better? I think I think we can hear you now. Go ahead. Thank you your honor. May it please the court for the record my name is Curtis Blood. I'm representing Antwon Jenkins v. Ellis and thank you for agreeing to hear me today by telephone. This appeal presents one issue with two parts. Did the government breach the proffer agreement and if so, does harmless error analysis apply? The defense maintains that the government did breach the proffer agreement and that harmless error analysis should not apply to a breach by government of an agreement that the government makes with its person. The defense requests a neutrality. This appeal comes down to 20 or so words on the first page of the proffer agreement where it says no statements or information provided by your clients will be used against your clients in the government's case in chief. Two sentences later the letter states the government may make derivative use of any information revealed. Jenkins told the agents that the gun was in a toilet tank at his house. At trial the agents testified that they went to the house, they searched, they didn't find the gun, they asked Jenkins' girlfriend, she made a call, and the gun was brought. Counsel, didn't that come out on cross-examination? Much of it did, your honor. Right, so if he introduces it himself, why are we arguing this point? Well, the part that was brought out in cross-examination was to flesh out the record that the agents were using, were talking about received from Jenkins. Well, the government can't be held responsible for a breach of the proffer agreement that defense counsel engaged in. Your honor, by the time cross-examination began, the horse was out of the barn. Well, not really. The direct examination of the agents was very Well, that's true, your honor. So what's the breach? Yes, your honor. What's the breach, if that's true? Well, it's the distinction between statements provided and information provided. The information will be the agents did not tell the jury what statements were made, but they did tell the jury information that Jenkins provided. The information specifically being where to look for the gun, as well as the fact that the gun didn't even exist anymore. It was not at the bottom of the list of the river. That was already out. The government had already violated the agreement with information. So, counsel, are we to understand your argument that had Jenkins not told them where he believed the gun was, that then they never would have gone to the house? Is that your argument, that it's the but for Jenkins providing the information they would not have found the gun? Well, that's a strong way to put it, your honor, but yes, yes, the record supports that, that there was no effort to recover the gun or belief that it was anywhere in particular until Jenkins provided it. Yes. What for? Okay, so if then you are arguing that that itself is the breach, where's the harm? Because isn't it true at trial that the government didn't need the physical gun because there were a number of witnesses, including the victim, who testified to the existence of the gun? Well, I agree with that, your honor. The prosecution for the gun, the evidence that a gun was involved, not all of the evidence that ultimately came in, but certainly the fact that a gun was involved could have been proved. A crime based on use of the gun could have been, I mean, the conviction could have been sustained without the gun being recovered? Absolutely. All right, then how is it not harmless? Well, it could be harmless and that's up to this court, but our position is that this court should not even be over there. That when the government makes an agreement with its prisoner and it breaches that agreement, we shouldn't be haggling over whether it was harmless. We should be holding the government, our government, the United States of America, we should be holding to its agreement. Once we're talking about whether it's harmless or not, we're just haggling and we're already down in the mud. We're already wrestling around in the dust. In some ways we're no better than the prisoner. These agreements must be fulfilled. If it's for government, these agreements must be fulfilled. We must not look at harmless error. We've just got to enforce the agreement. Your Honor, who is going to enter into an agreement like this if the government is just going to weasel out of it? It's always a question, but that's what we're getting at. These agreements are the basis for a plea bargain. Isn't a proffer different from a plea bargain? A proffer is where the defendant goes in, hopefully eyes wide open, and makes a statement. Throughout the language of the proffer letter, the government repeatedly says that they reserve the right to use the information, at least in a derivative way, that the defendant provides. It's not a plea agreement because really, what's the defendant getting that's stated as a benefit? In a plea agreement, the defendant gives up certain rights, but then gets a benefit from the government by pleading guilty, whether by avoiding trial, whether by agreeing to a lesser charge. There is some quid pro quo between the two parties. In a proffer agreement, there isn't. But, Your Honor, there is. The government agrees not to use any information provided by my client during his case in chief. And reasonable minds may differ as to how much of what they use was derivative, and clearly some of it was, but when you get right down to the rub of it, some of it wasn't. Some of it was information provided by my client. And the government should be held to that. It's the only promise they made. My client had a right to remain silent. The government gave him a promise in exchange for giving up that right, and he gave it up. And what did he get? He didn't get anything. Well, he didn't bargain for or receive derivative use immunity. He only got direct use immunity. So what exactly, which questions during direct examination of the agents violated the direct immunity provision? Because this was not a derivative use immunity agreement. So what questions specifically violated the agreement? Not in exact words, but agents, where did you go? What did you do? We went to the house at Cahokia. In Cahokia, we looked for... How is that a direct, a violation of the direct use immunity agreement? That's derivative. Well, your honor, if the court feels that that is derivative, then I'm lost. But the word derivative can be interpreted in such a way that the agreement not to use information provided is meaningless. You can say anything is derivative in a sense. You can say that information provided by my client is basically whittled away to zero by derivative use. But does that mean then that the government could just promise not to use information and then say afterwards, well, that was meaningless? We didn't actually give anything? Because that's what we're getting at, and the government drafted disagreements. So information provided by your client has got to mean something. It's got to mean more than nothing. And if it means anything, then the government shouldn't have been proving that these agents went to that house to search for that gun. So counsel, what would your something that is derived? I think reasonable minds can differ. And it's the sort of thing that depends on the facts. It's an abstract definition, but we've got concrete facts. I don't have them. All I know is that not all of it could be derivative. I mean, some of it by necessity must not be derivative, because if all of it is derivative, then information provided by your client means zero. Your time has expired, Mr. Blood. Thank you.  Ms. Stone. May it please the Court. Counsel for Mr. Jenkins, good morning. The Court asked a moment ago what derivative means, and I'd like to start there. Under the proffer agreement that the government provided in its entirety to the Court in its appendix, this Court is directed by the case law of the circuit to interpret it using its plain and ordinary meaning. This is the term that Mr. Jenkins acknowledged by signing the proffer agreement that he understood. This is a term that he had the opportunity also in writing he acknowledged to speak with counsel. And this is the term to which he agreed. He is now coming to this Court and saying he just didn't like it, and that it shouldn't apply because the government used the information derivatively. We followed up on investigative leads, which is permissible, in the second paragraph of the proffer agreement. And derivative in its plain meaning means to derive from, came from. But the United States doesn't go that far. We agree. Our argument begins with the fact that we simply did not use this information on direct, as the Court has already questioned appellant this morning. No questions on direct to the agents ever asked, did you go and where did you look in the toilet tank? Never pointed to the words, toilet tank. In fact, the government agents never even used the words toilet tank in their responses. We did not use the information that said at my house. The agents never testified. We went to Antoine Jenkins' home on August the 3rd, 2012. The agents generally spoke about what they did and what they were looking for. And only on cross-examination did that information as literally used in the questions on cross-examination by defense counsel. What information did you have? Defense counsel forced the agents to provide the response involving Mr. Jenkins, revealing that the gun was in the toilet tank. Well, as I understand Jenkins' argument, it is that any questions by the prosecution about the search process itself were off limits because that would make use of information obtained during the problem would be direct use of information. It is distinct from direct use of statements. I mean the immunity language is that the government promised not to make any direct use of statements or information and he's drawing a distinction between direct use of statements and direct use of information and this falls in the latter category. We did not make direct use of that information. To understand the scope of the term, the basis of Appellant's argument is that Mr. Jenkins provided the location. What did he provide? He said it was in the toilet tank at his house. Had he said the gun is at my house, perhaps the United States may have had a direct use there. However, his response was very specific, very detailed. That information, toilet tank, home, was protected. Again, we never used the words toilet tank on direct. The agents never responded, saying even his house. That fact had been put into evidence prior to their testimony. Well, in fact, the gun was not where he said it would be. Exactly, Your Honor. It simply was moved. The facts that came out on direct as well as on cross-examination demonstrated very clearly that the information provided didn't actually turn out to be true and there's no distinction between covering incorrect or correct information. It's simply the information given by that defendant and we argue in our brief, Your Honor, that this was an investigative lead. We followed up. The gun did not turn out to be where Mr. Jenkins indicated and the United States provided to the jury that information, how the gun came to be, through his girlfriend and telephone calls and the delivery of the gun. So had the gun been found in the toilet tank, would you be arguing then that that was direct use of information that he gave if you then turned around and introduced the gun into evidence without saying where it came from, without saying that he told you it was in the toilet tank, but that you actually introduced the gun into evidence? Your Honor, as the trial counsel, I'm not certain I would have made the same trial decision had the gun been in the toilet tank where Mr. Jenkins told us it would be. However, through derivative use, investigative leads, and the simple fact that it was not where he told us it would be, the United States came forward to trial and made that decision. You're asking a very different strategic decision. Are you referring to the decision to admit the gun at all? If the gun had been exactly where he said it had been, that would have required a different strategy in terms of even considering this proffer letter and how it would apply under that proffer letter. It still is following up on an investigative lead, which paragraph two allows us to do, follow up on an investigative lead, and we could argue our argument would remain the same. Right. I mean, that you're hedging on this at all strikes me as unusual for a prosecutor. I can't imagine you would forego admitting the gun as simply falling within the derivative use exception that was in the agreement. Well, Your Honor, it was a trial strategy decision based on those particular facts, and it's difficult to say today far after that trial and the trial decision exactly how we would have made if the facts were different. But yes, we would have the derivative use, and that would be something that we would consider. Again, we don't have to prove, we don't have to admit a gun. We had simply enough testimony from the cooperating defendant who actually handled the gun, described the gun in court to acquire a conviction. What is your eyewitness testimony? What was your eyewitness testimony by the victim? About the gun, Your Honor? The victim described that there was a firearm. He described the sequence in which he first saw the firearm, how the firearm was held to his head, how twice in the vehicle the firearm was pointed directly at him to threaten him, essentially, and to tell him that they were going to shoot him. He described the firearm as a black handgun. He's not a firearms expert. That was simply the testimony that he provided. So he provided multiple instances during the chronology of events during the kidnapping in which the firearm was used and pointed at him. One very specific instance in which the firearm was placed against his head. Is it necessary to introduce a gun? Juries want to see it. It has a certain jury appeal, Your Honor. I'm sorry? It has a certain jury appeal. Well, but that's not what I asked. Looking back, was it necessary? Perhaps not. It has certainly created a much more difficult path for the United States in the aftermath, but we maintain that we did not breach the agreement in any way. My question goes to whether it's harmless or not. It wasn't vital to our case. We argued that in the brief. We provided the testimony and cited to the testimony wherein the government had information about a firearm and the firearm itself by multiple witnesses. So therefore, it was discussed in closing. Again, the concept of how it was used. It wasn't vital to our case. We could have proven the case. There was a jury instruction on it that the gun, about the gun, and we didn't need to. We did. It certainly has jury appeal. Mr. Blood spent significant time talking about harmless error. The United States position is that plain error applies in this case, not harmless error, and that we wouldn't even reach the question of automatic reversal. It's his burden to show error. We argue there is no error, and that would be under this Court's case law. United States v. Madison is a case from this circuit in which a defense attorney, again, did not raise the issue whatsoever. There was a suppression motion here. There was a motion to quash the indictment based on this proffer violation and a suppression motion to exclude the gun based on the proffer violation. So how is that not adequately preserved? Your Honor, we don't find the ruling of the suppression motion definitive. The argument here is that the government... How is that not definitive? Well, first, the motion... The gun gets in. Yes, ma'am. First, the motion was based on the introduction of the gun and not the testimony, and the argument here relies on both the testimony and the admission for breach purposes. The argument of breach was never resolved by the district court, never put to the district court in that specific terms. Defense counsel could have asked for a new trial, could have moved for a mistrial during the case. They never did so whatsoever, and the court specifically in its order said that their basis of the suppression argument was on the fact that the United States violated the proffer agreement, and the court pointed out that to do so, we'd have to be in trial. Essentially, the court said, we have not yet started. I see my time has expired. Thank you so much. Thank you, Ms. Stone. Thanks to both counsel. The case will be taken under advisement.